# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| **PROFESSIONAL CONSULTATION** | | CIVIL ACTION |
| **SERVICES, INC.** d/b/a PCS-GLOBAL | * | |
| 17197 N. Laurel Park Drive | | NO.:_____ |
| Livonia, MI 48152 | * | |
| | | |
| *and* | * | |
| | | |
| | * | **JURY TRIAL** |
| **JOHN D. MLINARCIK** | | |
| 40462 Beechwood Ct. | * | **DEMANDED** |
| Northville, MI 48168 | | |
| | * | |
| *and* | | |
| | * | |
| **CONNIE K. MLINARCIK** | | |
| 40462 Beechwood Ct. | * | |
| Northville, MI 48168 | | |
| | * | |
| *and* | | |
| | * | |
| **GEORGE A. KUEHN, JR.** | | |
| 1549 Bentley Circle | * | |
| Bel Air, MD 21015 | | |
| | * | |
| *Plaintiffs,* | | |
| | * | |
| **vs.** | | |
| | * | |
| | | |
| **SCHAEFER & STROHMINGER, INC.** | * | |
| 4212 Ridge Road | | |
| Baltimore, MD 21236 | * | |
| **SERVE ON: JOSEPH M. JANKOWSKI, III** | | |
| 4212 Ridge Rd. | * | |
| Baltimore, MD 21236 | | |
| *and* | * | |
| | | |
| **S & S MANAGEMENT SERVICES, INC.** | * | |
| 4212 Ridge Road | | |
| Baltimore, MD 21236 | * | |

1

**SERVE ON: JOSEPH M. JANKOWSKI, III**
               4212 Ridge Rd.             *
               Baltimore, MD 21236
                                                *

*and*

                                                *

**RIDGE ROAD ASSOCIATES**
4212 Ridge Road                     *
Baltimore, MD 21236
**SERVE ON: JOSEPH M. JANKOWSKI, III**   *
               4212 Ridge Rd.
               Baltimore, MD 21236    *

*and*                                             *

**SCHAEFER & STROHMINGER**      *
**BEL AIR, INC.**
4212 Ridge Road                     *
Baltimore, MD 21236
**SERVE ON: JOSEPH M. JANKOWSKI, III**   *
               4212 Ridge Rd.
               Baltimore, MD 21236    *

*and*                                             *

**SKS AUTO PARK, INC.**               *
3132 Aireys Road
Cambridge, MD 21613             *
**SERVE ON: JOSEPH M. JANKOWSKI, III**
               4212 Ridge Rd.            *
               Baltimore, MD 21236
                                                *

*and*
                                                *

**SMITH MOTOR COMPANY**        *
10800 Philadelphia Road
White Marsh, MD 21162          *
**SERVE ON: JOSEPH M. JANKOWSKI, III**
               4212 Ridge Rd.            *
               Baltimore, MD 21236
                                                *

*and*
                                                *

**BEL AIR DODGE, INC.**

2001 Bel Air Road        \*
Fallston, MD 21047
**SERVE ON: JOSEPH M. JANKOWSKI, III**   \*
     4212 Ridge Rd.
     Baltimore, MD 21236     \*
*and*

              \*

**LOUIS M. SCHAEFER**
511 Pintail Point Farm Lane      \*
Queenstown, MD 21658-1263

              \*

*and*

              \*

**DAVID G. STROHMINGER**
452 River Road         \*
Arnold, Maryland 21012

              \*

*and*

              \*

**JOSEPH M. JANKOWSKI, III**
17 Stoddard Ct.         \*
Sparks Glencoe, MD 21152-9367

              \*

    *Defendants.*

              \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COMPLAINT

1.          COME NOW Plaintiffs, Professional Consultation Services, Inc., a

Livonia, Michigan corporation, John D. Mlinarcik and Connie K. Mlinarcik, of

Northville, MI and George A. Kuehn, Jr., of Baltimore, Maryland, by and through their

undersigned counsel, and sue Schaefer & Strohminger, Inc. S & S Management, Inc.,

Ridge Road Associates, Schaefer & Strohminger Bel Air, Inc., SKS Auto Park, Inc.,

Smith Motor Company, Bel Air Dodge, Inc., Louis M. Schaefer, David G. Strohminger

and Joseph M. Jankowski, for racketeering activity under 18 U.S.C. § 1961, Racketeer

Influenced and Corrupt Organizations (RICO), et seq.; 18 U.S.C. § 1341, Mail Fraud;

18 U.S.C. § 1343; Wire Fraud, 18 U.S.C. § 1951, Interference with Interstate Commerce;

18 U.S.C. § 1953, Racketeering; 18 U.S.C. § 1962(d), Conspiracy to commit

Racketeering; 18 U.S.C. § 1964, (RICO) Civil Remedies; and for fraudulent inducement,

constructive fraud, to set aside conveyance of real estate due to fraud, quantum meruit,

tortious interference with contractual relations, and wrongful termination, under the

common law of Maryland and, in support of such claims, say:

## JURISDICTION

2.          Jurisdiction in this Court is founded upon 28 U.S.C. § 1331,

federal question jurisdiction, and 18 U.S.C. § 1964(c) which provides that "any person

injured in his business or property by reason of a violation of 18 U.S.C. § 1962,

Racketeer Influenced and Corrupt Organizations, Pattern of Racketeering (RICO), of this

chapter may sue therefore in any appropriate United States district court and shall recover

threefold the damages he sustains and the cost of the suit, including a reasonable

attorney's fee…".   Plaintiffs are persons within the statutory definition, being "any

individual, legal entity or association of individuals…", which have been injured in their

business or property by reason of violations of section 1962 of Title 18.  This Court also

has supplemental jurisdiction over those portions of the Complaint that arise under state

law pursuant to 28 U.S.C. § 1367(a).


## THE PARTIES


3.        Plaintiff, Professional Consultation Services, Inc. ("PCS-

GLOBAL"), is owned and operated by Dr. John D. Mlinarcik, and is a national

professional consultation and training company with nearly thirty (30) years experience

and success in the automotive industry, and is a former partner of R. L. Polk, Inc.


4.        Plaintiff, John D. Mlinarcik ("Dr. John Mlinarcik"), who is the

CEO and president of PCS-Global, and previous owner of the subject real property.

Since in or about January 1977, Dr. John Mlinarcik has been CEO and President of

Professional Consultation Services, with its primary headquarters in Harrison and

Livonia, Michigan.


5.        Plaintiff, Connie K. Mlinarcik ("Mrs. Mlinarcik"), who is the wife

of Dr. John Mlinarcik and previous owner of the subject real property.  Since in or about

January 1982, Mrs. Mlinarcik has, as wife and top-level advisor, been employed through

5

PCS-Global as the manager of the former headquarters for PCS-Global, the Carriage House Inn Bed & Breakfast and Conference Retreat Center.

6.     Plaintiff, George Kuehn, ("Kuehn"), was since on or about March 24, 2003, the Certified Financial Officer (CFO) of S & S Management, and reported directly to Joseph Jankowski III. Kuehn now serves as a Project Team Leader on staff at the Johns Hopkins Health System.

7.     Defendant Schaefer & Strohminger, Inc. ("S&S") is a Maryland automobile dealership owned by Louis Schaefer and David Strohminger. They have dealerships in multiple Maryland counties, including Harford, Baltimore, Baltimore City, and Cambridge.

8.     Defendant S&S Management Services, Inc. ("S&S Management") is a Maryland corporation charged with oversight and management of Schaefer & Strohminger companies, and is a subsidiary company owned by Schaefer & Strohminger and Louis Schaefer as majority shareholder.

9.     Defendant Ridge Road Associates ("RRA") is a Maryland corporate member-owner company which operates as a leadership transition team for the future executive team of Schaefer & Strohminger companies.

10.            Defendant Schaefer & Strohminger Bel Air, Inc. ("S&S Bel Air")
is a Maryland automobile dealership owned by Louis Schaefer.  It is operated from the
Schaefer & Strohminger headquarters on 4212 Ridge Road in Baltimore, MD and is the
entity under which several car dealerships operate with trade names in the Bel Air,
Maryland area.

11.            Defendant SKS Auto Park, Inc. ("SKS") is a Maryland Eastern
Shore automobile dealership owned by Louis Schaefer.  It is operated from its
Cambridge, Maryland location on 3132 Aireys Road.

12.            Defendant Smith Motor Company ("Smith Motor") is a White
Marsh, Maryland automobile dealership owned by Louis Schaefer.  It is operated from its
store at 10800 Philadelphia Road, White Marsh, MD 21162.

13.            Defendant Bel Air Dodge, Inc. ("Bel Air Dodge") is a Fallston,
Maryland automobile dealership owned by Louis Schaefer.  It is operated from its store at
2001 Bel Air Road, Fallston, Maryland 21047.

14.            Defendant Louis M. Schaefer ("Lou Schaefer") is a principal
majority owner and partner in the above companies and lives in White Marsh, Maryland
and, from Wednesday mornings through Sundays, on the Eastern Shore at the Wye River
Plantation, Pintail Point Resort, which he owns, being flown there each week by

company helicopter or one of the two company jets, and is a principal in the multiple ownership entities sued herein. He is a partner in RRA.

15.        Defendant David G. Strohminger ("Strohminger") is a principal minority owner and partner in the above companies and lives in Baltimore, and is a principal in the multiple ownership entities sued herein. He is a partner in RRA.

16.        Defendant Joseph M. Jankowski ("Jankowski") is a share holder in S&S and the CEO of Louis Schaefer's companies, and is a principal or majority-member shareholder in multiple ownership entities sued herein. All employees and personnel report to Mr. Jankowski as does the President and minority share owner of the S&S companies, David Strohminger. He is a partner in RRA.

## RELEVANT INDIVIDUALS

17.        **William H. Keyes ("Keyes"):**  Since in or about January 1980, was the Variable Operations Director for S&S and SSM, and reported directly to Jankowski. He is a partner in RRA.

18.        **Michael Schaefer ("Mike Schaefer"):**  Since in or about 1970, was a partner with his father Lou Schaefer in S&S companies and is a store manager at Schaefer & Strohminger Delmarva Auto Park on the Eastern Shore of Maryland. He is a partner in RRA.

19.     **Donald A. Gurney ("Gurney"):**     Since in or about 1999, was a partner in Ridge Road Associates, a leadership entity of S&S, and who, in the year 2001, was the plaintiff in a successful lawsuit against S&S, RRA and its various entities and corporations, regarding contractual and business violations committed against him by S&S.

20.     **Tony Gomez ("Gomez"):**  Is a retired Marine and accomplished car sales executive who since in or about 2003, was a consultant and employee of PCS-Global and who relocated to Baltimore from the Detroit, MI area in order to assist in the restructuring of S&S companies as a PCS-Global executive level employee.

21.     **Chris "Lucky" Gomez ("Lucky"):**  Since in or about 2003, was a consultant and employee of PCS-Global and who relocated to Baltimore from the Detroit, MI area in order to assist in the restructuring of S&S companies as a PCS-Global employee.

## FACTS AND MATTERS COMMON TO ALL COUNTS

### Subject Real Property

22.        The real property subject of this action is a 127 acre tract of land located at 1515 Grant Ave., Harrison, Clare County, Michigan 48625 (hereinafter, the "Property"). The Property was improved as a Michigan-licensed, commercial Bed and Breakfast and Corporate Retreat Center located upon the shores of Budd Lake, appraised at a commercial value of $2.5 million dollars, effective date of October 21, 2002.

### Subject Personal Property

23.        The personal property subject of this action is a year 2001 Donzi 39ZSC thirty-nine foot (39') boat thought to be presently in storage at A&M Marina on the Maryland Eastern Shore in Grasonville, Maryland, or at Pintail Point Resort, Queenstown, Maryland, with a purchase price in 2001 of $499,000 dollars and a present "blue-book" estimated market value of approximately $200,000 dollars.

### STATEMENT OF OPERATIVE FACTS

### As to Plaintiff PCS-Global

24.        On or about February 15, 2002, Defendants' hired PCS-Global to perform an in-depth consultation review, conduct strategic planning and advise on S&S's re-organization and implementation steps. The initial contractual relationship was memorialized under two letter agreements, for professional remuneration totaling approximately $1.2 million dollars. The letter agreements are incorporated herein as EXHIBIT A.

25.     On or about June 19, 2002, PCS-Global developed, produced and implemented a reorganization and restructuring strategy which included referral to the S&S companies for subcontracting a "branding" company, whose purpose was to assist PCS-Global on behalf of S&S in developing for implementation throughout Baltimore City and elsewhere, a new and innovative branding slogan.  Such a slogan was developed by the PCS-Global strategic partner "branding" company, and was provided to defendants. Defendants have successfully utilized and still utilize the slogan, namely: **"Schaefer & Strohminger: A hard name to say, *an easy place to do business.*"**

26.     From early in the year 2002 throughout the following five years, Defendants did begin to conspire to and to utilize the mails, wires, and electronic mails to continually deceive, through a scheme and artifice to defraud, induce by pretense PCS-Global into believing S&S would pay PCS-Global consultancy fees, including an escalating rate capped at $3 million dollars.

27.     In or about November 2002, after accomplishing what was known to both companies as Phase I and Phase II/Transition and upon starting Phase III/Completion of the reorganization and restructuring, PCS-Global was informed by defendants' that the consultancy relationship would be terminated unless PCS-Global would concede to provide added "security" to S&S in exchange for an ongoing, competitive payment scheme over another two years with a cap at $3 million dollars.

28. The "security" that defendants' conspired to obtain by pretense and which Jankowksi and Lou Schaefer desired was for Dr. John Mlinarcik and his wife Connie Mlinarcik to "sell" S&S their Budd Lake, Michigan bed & breakfast Inn, retreat and conference center, known as the Carriage House Inn, to S&S Management. This 127 acre estate was appraised at $2.5 million dollars as commercial real estate, and by transferring title of the property to S&S, Dr. John & Connie Mlinarcik were told that PCS-Global would be given a two year, $3 million dollar contract, in addition to the $480,505.20 in consultancy fees already paid to PCS-Global by S & S for all Phase I and Phase II/Transition work performed, and in addition to Transition/advance payments through the date of title transfer which was to total $375,000. Refusal to provide the requested "security" would result in a termination of the consultancy, which would leave PCS-Global heavily extended and front-loaded after months of work during the Transition to the final reorganization Phase, and would expose PCS-Global to major corporate financial loss as numerous high-end clients had been turned down due to the ongoing work with S&S, loss of intellectual property and company secrets and implemented technologies. Furthermore, Lou Schaefer "sweetened" the scheme and artifice to defraud by extending employment to Connie Mlinarcik at his Pintail Point Farm bed & breakfast retreat center, for the purpose of gaining her trust and expertise in bed & breakfast management, and for deceiving and scheming to induce the Mlinarcik's into moving their corporate headquarters and home to Baltimore, Maryland or its vicinity.

29. On or about January 17, 2003, Dr. John & Connie Mlinarcik did transfer equitable title to their real estate to S&S in exchange for the $3 million dollar contractual arrangement, in order to prevent substantial and severe loss to their corporation and

employees, and began to make preparations to move to Baltimore, Maryland due to the deepening level of involvement in the S&S companies, and the pending upcoming September 2003 real estate settlement.

30.     From on or about January 2003 through September 2003, defendants' conspired and advanced their scheme and artifice to defraud PCS-Global through repeated payments for PCS-Global consultancy services, with PCS-Global executive staff being enticed to move to Baltimore, Maryland by S&S, to provide industry standard and new and innovative products and services for the automotive consultancy work performed by PCS-Global on behalf of S&S companies.

31.     On or about September 5, 2003, PCS-Global was in fact enticed into signing a deed conveying PCS-Global's bed & breakfast conference center and lake retreat, including all appurtenances and lands therewith, to S&S in exchange for S&S promises for payments to PCS-Global for work performed in a consulting relationship with S&S. These promised payments were to include an escalating return of up to $3 million dollars on all car sale profit increases S&S would realize due to the restructuring, reorganization, slogan branding and company-wide consultancy.

32.     Defendants did conspire and demonstrate skillful artifice in that the method of perfecting their scheme to defraud PCS-Global was performed by the requirement that PCS-Global credit back to S&S all payments made to date for consultancy work performed, to be considered as a "down-payment" on the real estate and, thereafter, by the withholding of cash and mortgage payments under these new terms once the real estate title was transferred from PCS-Global to S&S.

13

33.     Defendants' further demonstrated a scheme to defraud by inducing PCS-Global to accept a small "like new" yacht as part of an additional down-payment consideration of $275,000 to be paid for the real estate title purchase, which title to the said boat was to become PCS-Global's, along with the boat itself, on January 1, 2005. This boat transfer "down-payment" was provided to Dr. John & Connie Mlinarcik on a HUD-1 form of the United States of America, Department of Housing and Urban Development, at settlement on or about September 5, 2003, which form was in fact fraudulent in that no boat was thereafter handed over to the Mlinarciks. (SEE EXHIBIT B, "personal property credit" for $275,000.00). S&S Nautical and defendants have refused and still refuse to transfer title and possession of said boat to PCS-Global, while retaining title to the real estate property.

34.     Throughout the years 2003 through 2006, defendants did conspire and demand, withhold and charge PCS-Global, using the mails and wires, U.S. dollar sums amounting to $13,000 for "upkeep, use and maintenance" of the Donzi yacht, including charges for "diesel fuel" when the vessel is a gasoline powered engine and not a diesel, and defendants' have never provided Dr. & Mrs. Mlinarcik or PCS-Global with keys or the ability to take the boat out on the water, and he has never in fact done so. During this period of charges incurred for the boat, it was in storage for large portions of time at dry-dock on the Eastern Shore for repairs of chronic water leaks, black mold, interior damage, replacement of both out drives thus inaccessible to its rightful owners, and at no time was it used by PCS-Global, owners, officers or agents, or Dr. & Mrs. Mlinarcik, in any navigable use.

35.     On or about January 15, 2004, Joe Jankowski returned to work from a two month absence due to back surgery, whereupon he discovered that PCS-Global was in fact managing the S&S companies in his stead per the order of Lou Schaefer, while also moving ahead with restructuring the store manager positions to reflect industry standard management independence.

36.     On or about July 15, 2004, Joe Jankowski stated that he would not agree to more independence of the store managers as both Lou Schaefer and David Strohminger had agreed to during the restructuring and reorganization performed by PCS-Global.

37.     On or about July 24, 2004, defendants' conspired and advanced their scheme and artifice to defraud and delivered to Dr. John Mlinarcik a letter stating they were terminating the PCS-Global relationship with their companies, only ten (10) months after the transfer of the PCS-Global real estate to S&S ownership.

38.     Defendants' thereafter demonstrated a prior conspiracy and ongoing scheme and artifice to deceive and defraud PCS-Global in that they defaulted on all payment arrangements under Notes held by PCS-Global and secured by said real estate, while taking and keeping the PCS-Global land and yacht for their own pecuniary assets.

39.     Throughout the remaining months of the year 2004 and ongoing until March 7, 2006, defendants' did scheme and devise an artifice to further defraud PCS-Global through requiring, in order to provide for "an amicable settlement" to claims by PCS-Global and defendants' after the untimely termination of PCS-Global from its consultancy, its president Dr. John Mlinarcik and his wife to remain as "operational

15

managers" of the Carriage House Inn.  Defendants' further advanced this scheme upon

PCS-Global officer Dr. Mlinarcik by offering, in exchange for PCS-Global's

management of the Inn, to reimburse PCS-Global for certain expenses and bills in

managing the Inn for two years after the termination of the PCS-Global consultancy.

Defendants' failed and refused to reimburse PCS-Global its expenses in managing the

Inn, increasing their loss of approximately $3000 each month in operational expenses,

$2700 each month in salary for Connie Mlinarcik, and $17,171.80 expenses paid out of

pocket in 2005 by PCS-Global president Dr. John Mlinarcik to prevent deterioration of

the Inn and conference grounds, totaling at least $153,971.80.  Defendants' further

attempted to advance their scheme and artifice to defraud by demanding by their counsel

and agent that PCS-Global president Dr. John Mlinarcik "undertake no reckless acts" and

to remain at the Inn and to remain paying utilities for the Inn and grounds, which they

had no duty to do, in order to not "imperil the condition of the property."  Copies of such

schedule of Inn expenses paid, and demand, written and sent by S&S, by both the mails

and wires, are attached hereto as EXHIBIT C.


40.     On or about November 28, 2005, S & S further advanced and perfected

the scheme and artifice to defraud PCS-Global by demanding, through a telephone call

and electronic mail from their commercial title company counsel, that Dr. John Mlinarcik

and Connie Mlinarcik acquiesce to a refinancing scheme.  Dr. John Mlinarcik expressed

to the S&S title company counsel his concerns that S&S had defaulted on numerous

business agreements with PCS-Global, was currently holding his personal property

wrongfully, and could be attempting to refinance the Daimler/Chrysler first mortgage on

the former PCS-Global real estate in order to prepare to default on the mortgages or at least on the Notes held by Dr. John and Connie Mlinarcik and thereby deprive by theft his real estate lands.  By refinancing, S&S would not immediately jeopardize their multi-million dollar line of credit securing and providing the large S&S vehicle fleet and floor plan inventory through any foreclosure action.  The S&S commercial title company counsel stated that no such event of default would occur in that S&S held large assets with his client First National, and that the Mlinarcik's were therefore admonished to acquiesce in the refinancing in good faith.

41.     On or about December 15, 2005, S&S further perfected their scheme and artifice to defraud PCS-Global by failing to keep the former PCS-Global real estate first lien financed by the S&S Daimler/Chrysler Corporation line of credit, which line of credit was secured by a large floor plan inventory of vehicles, by carefully refinancing the loan only 12 months prior to purposefully defaulting on the Notes still held by PCS-Global.

42.     On or about December 15, 2006, Defendants', did conspire and perfect their scheme and artifice to defraud PCS-Global by notice that they would be defaulting on the Promissory Notes secured by the former PCS-Global real estate which S&S had given PCS-Global to secure payment for the real property they traded for the consultancy work performed, and to be performed, for S&S companies.

43.     That notice, sent by electronic mail in the United States, lays out a detailed and premeditated conspiracy and scheme and artifice to deceive, defraud and further injure PCS-Global in a statement whereby S&S informs PCS-Global they are defaulting on the Promissory Notes they gave PCS-Global and will no longer pay for the real property they purchased.  S & S then demands PCS-Global purchase back the bed and breakfast Inn and Conference center for $1.18 million dollars, and states that if PCS-Global refuses to pay or attempts to foreclose the property, S&S will ensure the foreclosure process will take "years to reach consummation" and result in PCS-Global incurring enormous "legal fees, auction commissions, expenses" and leave PCS-Global without "anything."  (SEE EXHIBIT D).

44.     S&S further exhibited a conspiracy, scheme and pattern to defraud PCS-Global by stating in that same wire communication that after any foreclosure action "to the extent you come up short" and decide "to pursue a deficiency judgment in the Maryland courts, [S&S] will take that unwelcome opportunity to counterclaim…" against PCS-Global in order to further deprive PCS-Global of their just wages and amounts owed them by S&S.

45.     Throughout the summer of 2003 and leading up to July 2004, defendants S&S Management Services, Inc., S&S, Joseph Jankowski and other of defendants' officers and personnel were actively engaged in the attempt to lure national PCS-Global executive professional consultants away from PCS-Global full-time employment and into the employment of S&S companies, which attempts to hire the consultants away and into

defendants' companies did in fact consummate with at least two PCS-Global consultants being lured away from full-time employment with PCS-Global and into the defendants' fulltime employment.

46.    On or about June 2002, Connie Mlinarcik, wife of Dr. John Mlinarcik, was recruited away from full-time employment with PCS-Global at the bed & breakfast Inn and retreat center and hired by Lou Schaefer to consult and serve as interim retreat center management staff at Lou Schaefer's Pintail Point Farm and Golf course, a bed & breakfast conference center, hunting, fishing and yachting location on Maryland's Eastern Shore.

47.    On or about December 31, 2002, Connie Mlinarcik's employment by Lou Schaefer at his Pintail Point bed & breakfast conference center and sporting location was terminated.

48.    On or about January 17, 2003, half of her entire salary was required to be reimbursed to S&S in order for PCS-Global to continue their consultancy with S&S, which further evidenced an ongoing conspiracy, scheme and artifice to defraud, interfere with interstate commerce and injure PCS-Global by obtaining cash payment "credits back" for prior work performed in good faith by PCS-Global and its employees.

**As to Plaintiff George A. Kuehn, Jr.**

49.     On or about March 24, 2003, Mr. Kuehn was hired by S&S Management Services, Inc. to act as its Chief Financial Officer (CFO) for all its companies and business locations, to prepare official documents, to sign financial reports and to serve the ownership of the company in its management and oversight of all financial activities.

50.     Mr. Kuehn's salary was agreed to be $110,000 plus 10% of any cost savings he would generate the company annually.  Mr. Kuehn's offer to apply for the position, subsequent initial interview, offer for employment and discussion of contractual terms were made to Mr. Kuehn by S&S executives through multiple telephone calls utilizing the wires of the United States, in furtherance of their conspiracy and scheme and artifice to defraud Mr. Kuehn.

51.     During the first year of Mr. Kuehn's employment, he received his pay and a $10,000 bonus.  Soon after receiving the bonus, at a year-end review with Joseph Jankowski, Mr. Jankowski communicated to Mr. Kuehn that his employment would no longer include any bonuses as his bonus "caps out at $10,000," a statement which was never before communicated to Mr. Kuehn, and was entirely different from his employment agreement.  Nevertheless, Mr. Kuehn continued to attempt to find cost savings for the S&S companies as its CFO in good faith.

52.     On or about June 22, 2004, in pursuit of such cost savings, Mr. Kuehn delivered to Joseph Jankowski a report of company-wide personnel expenses and credits not currently being reported on employee W-2s, namely gasoline usage.  The report was

prepared by Lee Bloomfield, an internal auditor for S&S Management Services, Inc., and was based upon the gas usage from May 2004. Mr. Kuehn advised Joseph Jankowski that the gas allowances should be reported on employee W-2s as wages or benefits.

53.     On or about the months of June through August 2004, conversations took place between Mr. Kuehn and Jankowski which materialized in Jankowski instructing Mr. Kuehn to obtain counsel regarding company-wide gas usage from Jay Goldman, who Mr. Kuehn believed was a partner at American Express Tax and Business Services, a recognized leader in the Baltimore, Maryland area in providing tax and business services to the automotive industry.

54.     On or about August 9, 2004, Mr. Kuehn spoke with Mr. Jay Goldman and provided a written report of the tax counsel provided by Mr. Goldman to Joseph Jankowski the same day.

55.     Mr. Goldman provided the following tax counsel to Mr. Kuehn regarding the prevailing view of the automotive industry's use of gasoline provision to employees:

      a.   That many automotive dealer clients no longer provide gasoline to its employees;

      b.   That providing gasoline is a taxable benefit when not used for business purposes;

      c.   That a specific automotive client desisted in its provision of gasoline to employees when it ceased use of demo vehicles as the determined demo allowance included the cost of gasoline in its calculation;

21

    d.  If gasoline is provided to employees, automotive dealerships track the expense in order to "W-2" the employees as taxable income.

56.    On or about the same day, at approximately 7:39pm, Jankowski responded to Mr. Kuehn by electronic mail stating therein "If we strictly go the W-2 route, it will cost the company even more..."

57.    The following day, August 10, 2004, Mr. Kuehn had a conversation at 12:24pm with Jankowski in which Jankowski stated the gasoline usage was discussed at the Executive Committee meeting. He stated that David Strohminger did not want to pursue any changes to the program, including tracking the expense in order to include in W-2s per employee usage, in that it could take "months to resolve." Jankowski stated to Mr. Kuehn that "the ultimate risk rests with the owners." Mr. Kuehn stated that he objected to the delay in that it could be considered intentional disregard of known accounting rules and procedures. Jankowski responded that no change would be made to the program.

58.    In or about June through September 2004, various other conversations concerning improper accounting practices of S&S Management Inc. were held between Mr. Kuehn and Jankowski.

59.    In or about that time, a conversation between Mr. Kuehn and Jankowski transpired concerning Jankowski's personal usage of a floor planned BMW series 7 company car of Schaefer & Strohminger GMC Pontiac. Jankowski was reimbursing the

interest charge and Mr. Kuehn discussed with him that the fair market value of the use of the automobile should be taxable to him. Jankowski ordered Mr. Kuehn to not report such usage on Jankowski's W-2 as he had a prior agreement with David Strohminger to reimburse the interest cost only.

60.     On or about October 5, 2004, Mr. Kuehn reviewed the Daimler/Chrysler "Amendment to Master Loan and Security Agreement and Related Documents" ("amendment agreement") with S&S in-house counsel, Gordon Priest. Exhibit A to the document included a Chief Financial Officer's Certificate and signature to attest the financial statements accurately reflect the financial condition of the S&S entities covered by the agreement. Additionally, the certificate included an attestation that the Chief Financial Officer "has no knowledge of any material adverse change in the condition of the entities...that has occurred after the date of the financial statements.

61.     During that review and meeting with in-house counsel, Mr. Kuehn informed him that he had not been provided the necessary financial information regarding the S&S entities covered by the agreement he was being asked to sign. Until he was permitted by S&S leadership to review everything that the document stated he had to certify, he would not be able to sign the agreement certificate in good faith.

62.     On or about October 12, 2004, Mr. Kuehn requested review of the S&S company-wide W-2 forms for its employees in his attempt to perform his job. This request was summarily denied by S&S Advisory Board executive leadership.

63.     On or about October 14, 2004, Mr. Kuehn's wife suffered a ruptured appendix and underwent emergency surgery at St. Joseph's Medical Center. Although the surgery was successful, yet due to an infection that developed from the rupture, Mr. Kuehn took a medical leave of absence to attend his wife's need for the remainder of the week and the following week. Upon his return to the office, Mr. Kuehn discovered that no documents had been provided him in order to allow him to review financial information so that he would be able to certify and sign the new Daimler/Chrysler Credit Corporation amendment agreement and to perform his job as CFO of S&S.

64.     On or about November 5, 2004, Joseph Jankowski and David Strohminger called Mr. Kuehn into a private meeting. At that meeting, David Strohminger stated that he had "lost confidence in data coming from [Mr. Kuehn's] office" and that he had a choice of either resignation or termination. Mr. Kuehn was told at the meeting that if he resigned he would be paid through the end of the month and if he chose to be terminated he would not be paid. Mr. Kuehn chose resignation and payment through the end of the month under extreme duress and in violation of his contract with S&S Management for employment.

65.     On or about November 16, 2004, Mr. Kuehn hand delivered a letter addressed to Louis Schaefer, David Strohminger and Joseph Jankowski tendering his resignation as Chief Financial Officer. The resignation letter was an immediate conveyance of the extreme duress Mr. Kuehn felt from Jankowski and Strohminger directly due to his questioning of accounting practices by S&S and his refusal to sign the Daimler/Chrysler "Amendment Agreement" certification as requested without his being

given access to the complete financial records and statements of the S&S entities covered by the agreement he was being required to sign.

66.     Upon his termination from employment with S&S Management, Mr. Kuehn sought and secured employment as a financial officer at John's Hopkins Medical Center, for an annual loss of $28,000.

67.     Since then, he has had further financial crises due to the loss of said income of $84,000, resulting in the necessity of two private loans totaling $30,000 in order to attempt to make up some of the difference in lost wages.

## COUNT 1

**Racketeer Influenced Corrupt Organization, Pattern of Racketeering Activity**

**((RICO) 18 U.S.C. § 1962(c))**

### THE ENTERPRISE

68.     Paragraphs 1 through 67 of this Complaint are re-alleged as if fully set forth herein.

69.     At all times relevant to this Complaint, defendants' supervised operations at their offices located in Baltimore, Maryland and at more than eight (8) locations throughout the State of Maryland and elsewhere.  Defendants', together with those offices and individuals, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), which enterprise was commonly known as Schaefer & Strohminger, Inc. automobile sales companies.  This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

## THE RACKETEERING VIOLATIONS

70.     From in or about May 2001, in the District of Maryland, the Western District of Michigan, the Eastern District of Louisiana and elsewhere, defendants' Joseph Jankowski, Lou Schaefer, and David Strohminger, being persons employed by and associated with the various business enterprises of Schaefer & Strohminger, Inc., which enterprises were engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and unlawfully conduct and participate, directly or indirectly, in the conduct of the affairs of the above enterprises through a pattern of racketeering activity, that is, through the commission of Racketeering Acts One through Twenty-Seven set forth below.

## MANNER AND MEANS OF THE RACKETEERING ACTIVITY

71.     From in or about May 2001 through in or about December 2006 and continuing through today, defendants' participated in a pattern of criminal conduct that involved seeking and demanding things of value on behalf of themselves and their various corporate enterprises in return for defendants' agreement to extend a business consulting relationship to PCS-Global and employment with George A. Kuehn, Jr., CPA, former CFO of S&S. The activities included, among other things, telephone calls to plaintiffs, extending offers to contract for services with plaintiffs, conducting official meetings, preparing official business and government documents, corresponding with plaintiffs and plaintiffs' staff members and executives, utilizing the services and honest

employment of plaintiffs, unlawfully discharging plaintiffs from their employment with S&S after gaining the offered benefit and after unlawful accounting practices were disclosed, and otherwise advancing the S&S corporate and personal ownership interests of defendants' through a scheme and artifice to defraud through relationships with plaintiffs. In addition, defendants' directed and caused to be directed monetary wire transactions in United States dollars, derived from certain of these schemes, and utilized electronic mails over the wires and the United States mails in order to defraud and swindle plaintiffs. Finally, defendants' concealed their conspiracy and schemes to defraud plaintiffs by, among other things, employing misleading business agreements, using multiple different corporate fronts in dealing, and omitting material facts in contractual offerings and public filings.

72.    The conspiracies and various schemes to defraud plaintiffs included defendants' acts of:  (a) telecommunications deals in Harrison, Michigan, Baltimore, Maryland, Maryland's Eastern Shore, New Orleans, Louisiana and elsewhere in violation of Title 18, United States Code, section 1962(c); (b) inducement to transfer real estate to S&S thereby enlarging the resort holdings of Lou Schaefer and defendants', trading a yacht as a "down-payment" for real estate owned by PCS-Global and thereafter refusing to hand over title and possession to PCS-Global, while retaining title and possession of the real estate for which it was traded, deprivation of honest wages and income by demanding re-crediting back of all monies paid for prior products and services as a "down-payment" on real estate, and thereafter, defaulting on the promissory notes held by plaintiff Dr. John Mlinarcik and secured by said real estate and threatening to drain PCS-Global of financial resources if they were to seek to foreclose

27

on the bed & breakfast real estate securing the defaulted promissory notes and/or seek a deficiency judgment upon foreclosure in violation of Title 18, United States Code, section 1962(b) & (c); (c) wrongfully deceiving plaintiff George A. Kuehn, Jr., in offering him an employment agreement compensation plan only to change the terms after inducing him to accept the offer of employment, wrongfully terminating his employment only days after he refused to certify the financial condition of S&S and attest to that condition on a large floor-plan "amendment agreement" credit line through Daimler/Chrysler, and after he insisted to Joe Jankowski that Lou Schaefer and David Strohminger be made aware of certain unethical and potentially unlawful accounting practices and procedures being implemented by Joe Jankowski in regards to S&S enterprises, those practices being discussed for over six (6) months with Jankowski in a good faith attempt to correct them, and after repeated requests to perform his job by reviewing financial statements that Jankowski was withholding from him, and conspiring to and advancing each of these schemes and artifices to defraud plaintiff Kuehn by utilizing the mails and wires in violation of Title 18, United States Code, section 1962(c); (d) wrongfully deceiving Donald A. Gurney, whose lawsuit against defendants' was settled out of court for approximately $375,000.00 on or about July 16, 2003; and (e) wrongfully deceiving such other individuals and entities involved in interstate commerce in violation of Title 18, United States Code, section 1962(c).

## THE PATTERN OF RACKETEERING ACTIVITY

73.     The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

## RACKETEERING ACT 1-5

### Telecommunications Made To PCS-Global

### For Deprivation of Its Honest Services, Materials and Property

74.     With respect to defendants' conspiracies and schemes to deprive citizens of honest wages and services, defendants' committed the following acts, any one of which constitutes the commission of Racketeering Acts 1-5.

75.     From in or about May 2001 through in or about December 2006, within the District of Maryland, Western District of Michigan, Eastern District of Louisiana and elsewhere, the defendants' did knowingly devise a scheme and artifice to defraud and deprive the citizens of the United States, namely plaintiffs and plaintiff's witnesses, of their right to the honest services of defendants' in interstate commerce, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from plaintiffs, in the form of chief financial operations, accounting, re-organization and restructuring products, organizational assessments, seminars, training seminars and one-on-one sessions, corporate training and strategic marketing plans, branding campaigns in coordination with plaintiff PCS-Global's national strategic partner, Wheeler Advertising, Inc. (who invented the current S&S slogan mentioned hereinabove), organizational alignment operations, installation of communications operations, human relations expansion operations, increased community profile and successful image of the company, senior leadership team

leadership training and organizational strategies, advisory board establishment, monthly and weekly store manager development and leadership training, performance management for company-wide employees, budgeting, forecasting and closed-meeting executive corporate participation, operational assistance of dealerships and stores, used-car "boot-camps" training seminars, training, support and refinement of Cowboy, Inc. sales management software system, implementation of telephone coaching and technologies including Call Bright® and CallCoach® software, office and store manager training, facilitation of IT group functions, conducting Daimler-Chrysler IDE meetings for customer focus, national convention speaking engagements, personal coaching for executive leadership with the two sons of Lou Schaefer, Mike and Mark Schaefer, and their wives.  Defendants' did contract and pay for some of the above services provided, only to continually and in an ongoing pattern, seek to deprive, cheat, deceive and corruptly demand additional financial transactions that resulted in the deprivation of all monetary payments and promises made for the above services, while defendants' then retained the services and products.

76.     For the purpose of executing such scheme and artifice to defraud, defendants did knowingly transmit and cause to be transmitted writings, signs, signals, and sounds by means of wire communications in interstate and foreign commerce, to wit, Wire Fraud on the following dates and in such manner:

| ACTS | DATE | WIRE COMMUNICATION |
|---|---|---|
| 1 | May 31, 2001 | Telephone conference call requested and held by Joe Jankowski with PCS-Global discussing the PCS-Global auto management assessment product termed Readiness Operational Assessments ("ROA") for the purpose of a potential purchase of that product from PCS-Global by Schaefer & Strohminger, Inc. |

| 2 | January 17, 2002 | Telephone conference call requested and held by Joe Jankowski in order to schedule a NADA presentation by PCS-Global of their products, in person at the NADA convention in New Orleans from January 25-28, 2001, with the intent to deprive PCS-Global of its products through deceit and fraud. |
| 3 | February 12, 2002 | Telephone call to PCS-Global from Joe Jankowski informing of formal acceptance of the PCS-Global Phase I agreement for services and products, for the purpose of inducing the PCS-Global executives and staff to fly to Baltimore and provide its package products for evaluation and consultation concerning eight (8) S&S stores across Maryland. |
| 4 | April 25, 2002 | Telephone call from Joe Jankowski to PCS-Global to discuss the progress of the ROA product store analysis data compilation by PCS-Global and to schedule an executive retreat at Pintail Point to review the PCS-Global products and ROA data results, and ongoing PCS-Global consultation with S&S. |
| 5 | December 19, 2002 | Electronic mail from Joe Jankowski to S&S Management, Dr. John Mlinarcik and PCS-Global executives requesting PCS-Global executives to attend an S&S consultation meeting in Baltimore, MD to facilitate business management relational improvement between Pete Brandwein and Joe Jankowski, with the knowledge that PCS-Global's contract had not been renewed and would not be renewed unless Dr. John Mlinarcik and Connie Mlinarcik would agree to sell their Bed & Breakfast Conference Center on Lake Budd, Michigan to S&S. |

(All in violation of Title 18, United States Code, §§ 1343, 1346 and 2.)

## RACKETEERING ACTS 6-18

### Inducing PCS-Global to Transfer Real Estate

### for False Pretenses

77.     With respect to defendants' schemes to deprive citizens of honest services, defendants' committed the following acts, any one of which constitutes the commission of Racketeering Acts 6 through 18.

78.     From in or about May 2001 through in or about December 2006, within the District of Maryland, Western District of Michigan, Eastern District of Louisiana and elsewhere, the defendants' did knowingly conspire and devise a scheme and artifice to defraud and deprive the citizens of the United States, namely plaintiff PCS-Global, of its right to the honest services of defendants' in interstate commerce, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from plaintiff, in the form of re-organization and restructuring products, organizational assessments, seminars, training seminars and one-on-one sessions, corporate training and strategic marketing plans, branding campaigns in coordination with plaintiff PCS-Global's national strategic partner, Wheeler Advertising, Inc. (who invented the current S&S slogan mentioned hereinabove), organizational alignment operations, installation of communications operations, human relations expansion operations, increased community profile and successful image of the company, senior leadership team leadership training and organizational strategies,

advisory board establishment, monthly and weekly store manager development and leadership training, performance management for company-wide employees, budgeting, forecasting and closed-meeting executive corporate participation, operational assistance of dealerships and stores, used-car "boot-camps" training seminars, training, support and refinement of Cowboy, Inc. sales management software system, implementation of telephone coaching and technologies including Call Bright® and CallCoach® software, office and store manager training, facilitation of IT group functions, conducting Daimler-Chrysler IDE meetings for customer focus, national convention speaking engagements, personal coaching for executive leadership with the two sons of Lou Schaefer, Mike and Mark Schaefer, and their wives.

79.    Defendants' did contract and pay for some of the above services provided in order to lead PCS-Global to believe full payment would be received for its consulting services, only to continually and in an ongoing pattern, seek to deprive, cheat, deceive and corruptly demand additional financial transactions that resulted in the deprivation of all monetary payments for those honest services, and transfer of real estate, including:

        a.    Transfer of Check No. 19480 in the amount of $53,333.00; transfer of Check No. 19571 in the amount of $11,484.00; transfer of Check No. 19787 in the amount of $64,817.00; transfer of Check No. 19993 in the amount of $65,741.20; transfer of Check No. 20738 in the amount of $37,750.00; transfer of Check No. 21394 in the amount of $25,000.00; transfer of Check No. 21449 in the amount of $12,500.00;

        b.    Transfer of real estate title at a price of $2.5 million dollars, while withholding, defaulting and depriving PCS-Global of approximately

$1.125 million dollars of the purchase price and thereupon threatening to deprive PCS-Global of additional financial resources if PCS-Global were to pursue a foreclosure upon the promissory notes secured by the real estate title;

c. Obtaining said real estate in violation of Title 18 U.S.C. section 1962(b), in that defendants' acquired the real estate business "Carriage House Inn" Bed & Breakfast and Retreat Conference Center through a pattern of racketeering activity resulting in the control of the real estate, the bed & breakfast and conference retreat business and business licenses, which conference retreat business was an enterprise engaged in, and affecting interstate and foreign commerce;

all being the official acts of defendants and defendants' enterprises.

80.     For the purpose of executing such scheme and artifice to defraud, defendants' knowingly did transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit, Wire Fraud on the following dates and in such manner:

| ACT | DATE | AMOUNT | MONETARY WIRE TRANSACTION |
|---|---|---|---|
| 6 | March 7, 2002 | $53,333.00 | Transfer of Check No. 19480 from S&S Management Services Account No. ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |
| 7 | March 19, 2002 | $11,484.00 | Transfer of Check No. 19571 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |
| 8 | April 17, 2002 | $64,817.00 | Transfer of Check No. 19787 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |
| 9 | May 21, 2002 | $65,741.20 | Transfer of Check No. 19993 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |
| 10 | September 6, 2002 | $37,750.00 | Transfer of Check No. 20738 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |
| 11 | December 12, 2002 | $25,000.00 | Transfer of Check No. 21394 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at |

| | | | National City Bank of Michigan/Illinois, Kalamazoo, MI |
|---|---|---|---|
| 12 | December 13, 2002 | $12,500.00 | Transfer of Check No. 21449 from S&S Management Services Account ****9734 at Allfirst Bank, Baltimore, MD to PCS-Global Account No. ****6466 at National City Bank of Michigan/Illinois, Kalamazoo, MI |

(All being in violation of Title 18, United States Code, §§ 1343, 1346, 1962(b) & (c) and 2.)

81.     And further for the purpose of executing such scheme and artifice to defraud, defendants' knowingly did transmit and cause to be transmitted in the mails, to wit, Mail Fraud on the following dates and in such manner:

| ACT | DATE | MAIL COMMUNICATION |
|---|---|---|
| 13 | June 21, 2002 | U.S. Mail letter concerning "materials and travel reimbursement" and including a payment for such in the amount of $22,130 (instead of an amount due of $69,965) where Joseph Jankowski attempts to further advance a scheme to defraud  by writing "there clearly will be Phase I activities performed as we move [sic] into Phase II, which will overlap as well, however they will be covered by reimbursements under the new contract". |
| 14 | January 17, 2003 | UPS overnight check for $12,500 minus charges for "Donzi Fuel" (small yacht traded to PCS-Global as $275,000 "down-payment" for Carriage House Inn real estate transfer of equity title the same day, to advance a conspiracy, scheme and artifice to defraud PCS-Global, in that the boat had not in fact ever been started or used in any navigable fashion by PCS-Global) and minus a UPS overnight fee.  The $12,500 payment was alleged to be an "advance" on the pending purchase by S&S of the PCS-Global real estate, made to deceive PCS-Global into believing it would be further paid its consultancy fees and to ensure PCS-Global kept their operations team members and executives on the ground in Baltimore working for S&S, so that the real estate title |

| | | transfer of Carriage House Inn to S&S would be perfected at the September 2003 closing. |
|---|---|---|
| 15 | July 17, 2003 | UPS overnight check for $12,500 alleged to be an "advance" on the pending purchase by S&S of the PCS-Global real estate, made to deceive PCS-Global into believing it would be further paid its consultancy fees and to ensure PCS-Global kept their operations team members and executives on the ground in Baltimore working for S&S, so that the real estate title transfer of Carriage House Inn to S&S would be perfected at the September 2003 closing.<br><br>**The foregoing January 17 and July 17 mail fraud being two samples of thirty (30) of the same payments to PCS-Global from January 17, 2003 through August 12, 2003, made solely to induce PCS-Global to transfer title to real estate to further the conspiracy, scheme and artifice to defraud and swindle PCS-Global, interfere with interstate commerce and obtain control of real estate and a business enterprise all through a pattern of racketeering.** |
| 16 | August 13, 2003 | U.S. Mail from Schaefer & Strohminger, S&S Management Services Inc. to PCS-Global, including an invoice from S&S to PCS-Global requiring PCS-Global to "reimburse" S&S for Donzi yacht insurance totaling $510.60, to advance the conspiracy, scheme and artifice to defraud PCS-Global. |
| 17 | August 19, 2004 | U.S. Mail from Schaefer & Strohminger, S&S Management Services Inc. to PCS-Global, including an invoice from S&S to PCS-Global requiring PCS-Global to "reimburse" S&S for Donzi yacht insurance totaling $231.96, to advance the conspiracy, scheme and artifice to defraud PCS-Global. |
| 18 | August 19, 2004 | U.S. Mail from Schaefer & Strohminger, S&S Management Services Inc. to PCS-Global, including an invoice from S&S to PCS-Global, for a "diesel" fuel sale to a "Lewis M. Shaffer" on July 2, 2004, being billed by S&S to PCS-Global as "Fuel for Donzi", the small yacht traded to PCS-Global, even though the Donzi yacht did not use diesel fuel as it has a gasoline-powered engine and even though the boat was unseaworthy and was said to be in dry dock. |

(All in violation of Title 18, United States Code, §§ 1341 and 2.)


## RACKETEERING ACT 19

### Defrauding Citizens of Honest Payments for Title to Real Property

**and Business Licenses**

82.     With respect to defendants' schemes to deprive citizens of honest services, defendants' committed the following acts, any one of which constitutes the commission of Racketeering Act 19.

83.     From in or about December 2005 continuing on up through the present, within the District of Maryland, Western District of Michigan and elsewhere, the defendants' did knowingly conspire and devise a scheme and artifice to defraud and deprive the citizens of the United States, namely plaintiffs PCS-Global, John D. Mlinarcik and Connie K. Mlinarcik, of its right to the honest payments for the transfer of the real property of plaintiff's, performed free from deceit, fraud, concealment, bias, conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking, receiving, accepting, and agreeing to receive and accept things of value from plaintiff, in the form of title to real estate and business and liquor licenses, and Promissory Notes, and other good and valuable consideration.

84.     Defendants did make some of the above payments required, only to continually and in an ongoing pattern, seek to deprive, cheat, deceive and corruptly demand additional financial transactions that resulted in the deprivation of all monetary payments, including, to wit: an electronic mail (email) dated December 15, 2006, from Gordon Priest, agent of defendants', in or near Baltimore, Maryland, to PCS-Global president Dr. John Mlinarcik in or near Harrison, Michigan, for the purpose of defrauding plaintiff PCS-Global, all in violation of Title 18, United States Code, Sections 1343, 1346, 1962(b) and 2, and all being the official acts of defendants' and defendants' enterprises.

WHEREFORE, because of injuries sustained by plaintiffs PCS-Global, John D. Mlinarcik and Connie K. Mlinarcik due to defendants' conduct of an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962 (b), (c) & (d), pursuant to 18 U.S.C. § 1964, civil remedies, treble damages, PCS-Global prays that the Court find in its favor and against defendants for:

A.      Compensatory (including consequential) damages of $ 5,075,000.00;

B.      Treble Damages of $15,225,000.00;

C.      Attorney's fees;

D.      Interest, costs; and

E.      Such other and further relief as the Court may deem proper and just.


### RACKETEERING ACTS 20-27

**Deceiving and Defrauding George A. Kuehn, Jr.**

**and Attempting To Include Him In A Conspiracy to Defraud**

**DaimlerChrysler Services North America LLC**

85.      With respect to defendants' schemes to deprive citizens of honest services, defendants' committed the following acts, any one of which constitutes the commission of Racketeering Act 20 through 27.


86.      From in or about March 2003 through in or about November 2004, within the District of Maryland and elsewhere, the defendants' did knowingly devise a scheme

and artifice to defraud and deprive the citizens of the United States, namely plaintiff
George A. Kuehn, Jr., of his right to payment for honest services provided defendants' in
interstate commerce, payments being provided free from deceit, fraud, concealment, bias,
conflict of interest, self-enrichment, and self-dealing, by corruptly demanding, seeking,
receiving, accepting, and agreeing to receive and accept things of value from plaintiff
while conspiring and scheming to defraud plaintiff of remuneration, namely:

      a.  By offering, via multiple telephone calls, an employment package that
was to include a 10% bonus for all savings realized through the work
performed by George A. Kuehn, Jr., only to withdraw the bonus plan
once the employment had substantially commenced, and to further
prevent ongoing savings by thwarting efforts by Mr. Kuehn to utilize
proper accounting practices regarding gasoline usage,

      b.  By requiring George A. Kuehn, Jr. to sign a certificate validating the
financial status of the S&S corporation to its primary lender for floor-
plan inventory and real estate leveraging, the DaimlerChrysler
Services North America LLC, without permitting a full disclosure of
financial records to Mr. Kuehn, and shortly thereafter by placing Mr.
Kuehn under extreme duress in demanding he resign or be fired
because of "loss of confidence in data coming from [Mr. Kuehn's]
office" as a pretense to cover the conspiracy, scheme and artifice to
defraud a financial institution through the attempted intimidation for
inclusion of Mr. Kuehn as a co-conspirator in that deception.

all being the official acts of defendants' and defendants' enterprises.

87.    For the purpose of executing such scheme and artifice to defraud, defendants' knowingly did transmit and cause to be transmitted writings, signs, signals, and sounds by means of a wire communication in interstate and foreign commerce, to wit, Wire Fraud on the following dates and in such manner:

| ACT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 20 | March 2003 | Telephone call to George Kuehn from S&S employee and owner Roland Jewett on behalf of Joseph Jankowski, III to inquire as to Mr. Kuehn's interest in a position with S&S |
| 21 | March 2003 | Telephone call to George Kuehn from Joseph Jankowski, III to conduct a telephone interview for a financial officer position with S&S Management Inc.; followed by a face to face meeting with David Strohminger and Joseph Jankowski |
| 22 | March 2003 | Telephone call from Joseph Jankowski, III offering a position with S&S as a Certified Financial Officer |
| 23 | March 2003 | Telephone call from Joseph Jankowski, III offering employment as a CFO for $110,000 annual salary with a 10% bonus package of all company-wide cost savings his work would produce S&S. A pay plan was established and placed in Mr. Kuehn's personnel file with S&S. |
| 24 | August 9, 2004 at 7:39pm | Electronic mail was sent to Mr. Kuehn by Joseph Jankowski, III stating "If we strictly go the W-2 route, it will cost the company even more…" in order to express his disagreement with Mr. Kuehn's desire to institute proper accounting procedures for company-wide free employee gasoline usage which to that date was not being reported on the employee's W-2s as proper accounting practices would suggest is necessary. |
| 25 | October 12, 2004 at 6:34pm | Electronic mail was sent to Mr. Kuehn from the S&S "Advisory Board" stating that some gasoline monitoring would be performed to attempt to create savings, although no corrections in accounting was mentioned for gasoline usage for the prior years or for reporting the continuing gasoline usage as "income" on employee's W-2s. |
| 26 | November | Electronic mail was sent from Joseph Jankowski, III to the entire S&S management stating "George Kuehn has |

| | | |
|---|---|---|
| | 8, 2004 at<br><br>5:58pm | tendered his resignation from Schaefer &<br>Strohminger..." even though Jankowski was fully aware<br>that only three days before he and David Strohminger<br>had called George Kuehn into a private meeting<br>expressing "lost confidence" in his work, and demanding<br>that Mr. Kuehn either resign or be fired, which<br>confidence being lost by Jankowski and Strohminger<br>after Mr. Kuehn's refusal within the last 31 days from<br>that date to fraudulently certify the S&S DaimlerChrysler<br>Credit Corporation's leveraged amendment agreement to<br>the S&S Master Loan. |

(All in violation of Title 18, United States Code, §§ 1343, 1346, and 2.)

88.     And further for the purpose of executing such scheme and artifice to

defraud, defendants' knowingly did transmit and cause to be transmitted a writing by

means of the United States mails in interstate and foreign commerce, causing to wit, Mail

Fraud, Frauds and Swindles, on the following dates and in such manner:

| ACT | DATE | MAIL COMMUNICATION |
|---|---|---|
| 27 | November 29, 2004 | Certified U.S. Mail addressed to and received by George<br>A. Kuehn, Jr. from Joseph Jankowski, III stating his<br>"surprise" at the resignation letter by Mr. Kuehn<br>"especially in light of the fact that I offered you a<br>professional courtesy of a resignation versus a<br>termination." Jankowski goes on to then allege by the<br>"tone" of Mr. Kuehn's resignation letter "One could<br>infer...that there is a company issue that is compelling you,<br>as CFO, to terminate your employment." Jankowski goes<br>on to write in furtherance of the conspiracy, scheme and<br>artifice to defraud that "it seemed especially inappropriate<br>in light of the deferential way the company allowed you to<br>depart." All being confirmation of the extreme duress<br>placed upon Mr. Kuehn to tender his resignation after<br>refusing to fraudulently sign the DaimlerChrysler Credit<br>Corporation Master Loan amendment agreement. |

(All in violation of Title 18, United States Code, Sections 1341 and 2.)

WHEREFORE, because of injuries sustained by plaintiff George A. Kuehn, Jr. due to defendants' conduct of an enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c) & (d), pursuant to 18 U.S.C. § 1964, civil remedies, treble damages, George A. Kuehn, Jr. prays that the Court find in his favor and against defendants' for:

A.    Compensatory (including consequential) damages of $ 114,000;

B.    Treble damages of $342,000.00;

C.    Attorney's fees;

D.    Interest, costs; and

E.    Such other and further relief as the Court may deem proper and just.


## COUNT 2

### Fraudulent Inducement

89.    PCS-Global repeats and re-alleges each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.


90.    On or about May 31, 2001, defendants Louis Schaefer, Joseph Jankowski and Schaefer & Strohminger, Inc., fraudulently solicited the professional consultation services of PCS-Global with statements and representations at a private breakfast meeting with PCS-Global executives that the proposed contractual professional services of PCS-Global with defendant Schaefer & Strohminger, Inc. would be for hire and consist of substantial cash payments for work performed under that Agreement totaling approximately $200,000.00.

91.     Louis Schaefer and Joseph Jankowski knew or should have known the representation to be false in that they asserted it of their own knowledge and will.

92.     On or about February 18, 2002, Schaefer & Strohminger, Inc., under direction by Louis Schaefer, contracted PCS-Global under "Letter Agreement 1", to memorialize the solicited terms of contract, to deliver and provide a team of their professional automotive consultants to assist defendants with a major reorganization and restructuring of their companies, and to provide a strategy to implement the restructuring in an ongoing manner.

93.     The representation was indeed false in that the contract Letter Agreement 1 was intended to lure plaintiff into performing work without pay.

94.     Any partial payments under Letter Agreement 1 were required by defendants to be "credited back" in order for plaintiff to continue work with defendant companies, even though defendants knew that plaintiff had already expended major resources and work in research, publishing and printing of professional evaluations of each defendant company location and had delivered their copyrighted products and materials to defendants, and had traveled extensively to and throughout the defendant company's region from the consulting headquarters in Michigan.

95.     PCS-Global acted in reliance upon the representation and suffered extensive and severe damages to its business and its reputation because of the

misrepresentation, in that it has lost its market share in the automotive industry and eventually lost all of its professional employees due to the actions of defendants.

96.     On or about June 19, 2002, defendants Louis Schaefer, Joseph Jankowski and Schaefer & Strohminger, Inc., under direction by Louis Schaefer, contracted PCS-Global under "Letter Agreement 2", to memorialize the solicited terms of contract, to deliver and provide a team of their professional automotive consultants to assist defendants with a major reorganization and restructuring of their companies, and to provide a strategy to implement the restructuring in an ongoing manner which would be for hire and consist of substantial cash payments for work performed under that Agreement totaling approximately $900,000.00.

97.     Defendants Louis Schaefer and Joseph Jankowski knew or should have known the representation to be false in that they asserted it of their own knowledge and will.

98.     The representation was indeed false in that all initial cash payments under the contract Letter Agreement 2 were intended to lure plaintiff into performing work without pay.

99.     Defendants intended plaintiff to rely upon such representations and to be induced to act and justified in acting upon it.

100.    PCS-Global did so act upon the representations in that it made immediate arrangements in its affairs for many of its major consultant officers to relocate to Maryland from Ohio and Michigan to perform duties under the contract, and defendants knew that plaintiff had and was so relying in good faith on the Letter Agreement 2.

101.    Both of the fraudulent inducements to contract were material in that defendants knew or should have known that by not paying plaintiff according to the terms of the Agreements, plaintiff was forced to "front-load" and forward all the expenses, costs, employee salaries and capital outlay for its own performance under the contractual Letter Agreements, and thereby was swindled out of its just and due wages.

102.    Furthermore, the fraudulent inducements to contract were material in that defendants knew or should have known that by requiring plaintiff to forward all of its expenses, costs, salaries and capital, plaintiff would be wrongfully forced to continue a contractual relationship without having the essential bargaining power necessary to prevent being forced to accept a contract of adhesion at a later date in order to avoid bankruptcy, default on its salaries or other severe financial hardship due to the fact that the multiple and widespread companies of defendants required a major undertaking of consultation services, financial and personnel outlay by plaintiff.

103.    Such intentional deceptions were fraudulent and material inducements to contract, with malice and/or reckless disregard for PCS-Global's rights, under the Letter

Agreements which have resulted in significant damage to PCS-Global, having been swindled out of their just and due wages for work performed, and having lost their market share and professional employees due to the misrepresentations and fraudulent inducements of defendants to contract.

WHEREFORE, based upon the fraudulent inducements to contract, PCS-Global prays that the Court find in their favor and against defendants for:

      A.      Compensatory (including consequential) damages of $ 2,000,000.00;

      B.      Punitive damages of $10,000,000.00;

      C.      Interest, costs; and

      D.      Such other and further relief as the Court may deem proper and just.

## COUNT 3

### Constructive Fraud

104.     PCS-Global repeats and re-alleges each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.

105.     On or about January 15, 2002, defendants Joseph Jankowski, Louis Schaefer and Schaefer & Strohminger, Inc., solicited PCS-Global to provide professional consultation services at its Maryland facilities.

106.    On or about February 18, 2002, defendant Schaefer & Strohminger, Inc. entered into Letter Agreement 1 with PCS-Global for it to provide professional consultation services to its companies throughout the Baltimore and Eastern Shore regions of Maryland.  On or about June 19, 2002, Schaefer & Strohminger, Inc. entered into Letter Agreement 2 with PCS-Global for it to continue its professional consultation services to defendant companies throughout the Baltimore and Eastern Shore regions of Maryland in an advanced and aggressive strategy.

107.    Louis Schaefer, after agreeing to each of the Letter Agreements, immediately transferred much of the business interaction with PCS-Global and its companies to Joseph Jankowski, and then failed to give attention to the ongoing details of the contractual relationship, or to properly oversee Joseph Jankowski who managed the contract relationships.

108.    Joseph Jankowski thereafter began a process of undermining the business relationship of PCS-Global and Schaefer & Strohminger, Inc., admitting to such interference in the restructuring advice and professional work of PCS-Global in a letter emailed to PCS-Global executives on June 14, 2004.

109.    Joseph Jankowski, upset with his position of total influence over the Louis Schaefer companies and store managers being, in his mind, jeopardized due to the restructuring which called for more autonomous leadership of the Schaefer & Strohminger store managers, met with Louis Schaefer and David Strohminger to

tortiously undermine the contractual work of PCS-Global both intentionally, negligently and with reckless indifference to the PCS-Global contract.

110.   Joseph Jankowski stated in a letter email the following:

"As you both know, there is no mystery as to how I feel about the General Manager concept, but just in case, I will reiterate my thoughts in writing. I think that our current structure will be the structure of the future…

"I also am very concerned about the timing of this type of structural change, since I feel that 100+% of our effort should be directed to driving traffic and selling cars.

"Lou [Louis Schaefer], Dave [David Strohminger] and I have discussed this in depth, and they both also know how I feel. What *we* have agreed to, is to review a proposed glide path that will allow some of our key managers, and potentially others in the industry to earn their way into a position, and possibly an equity interest."

111.   Joseph Jankowski did fraudulently undermine the contracted work of PCS-Global with defendants by substantial and continuous veiled threats and outright statements to defendant company owners Louis Schaefer and David Strohminger

designed and intended to lead PCS-Global to believe that its work was desired and needed, while at the same time preventing and employing a strategy to defeat the success of the professional services of PCS-Global and to thereby deprive them of their pecuniary profits and business contractual relationship.

112.    By virtue of Louis Schaefer's position in oversight of Joseph Jankowski, Louis Schaefer owed a fiduciary duty to PCS-Global.  PCS-Global reposed trust and confidence in Louis Schaefer, who had control and influence over all aspects of the PCS-Global contractual relationship.

113.    Among the fiduciary duties owed by Louis Schaefer to PCS-Global was the duty to properly supervise and manage the affairs of defendant companies and the employee executive manager of the companies, Joseph Jankowski.

114.    Louis Schaefer owed the fiduciary duty to prevent Joseph Jankowski from undermining and interfering with the work of PCS-Global under the contract.

115.    Louis Schaefer breached his fiduciary duty intentionally, with malice, and/or with reckless disregard for PCS-Global's rights by actively permitting Joseph Jankowski to privately meet with company owners in Joseph Jankowski's efforts to prevent the success of the PCS-Global's relationship with defendant companies.  In his breach of his fiduciary duty to PCS-Global, Louis Schaefer acted willfully and contrary to the best interests of PCS-Global.

116.   As a result of Louis Schaefer breaching his fiduciary duty, PCS-Global has suffered significant damages.

WHEREFORE, based upon the constructive fraud perfected by defendants, PCS-Global prays that the Court find in their favor and against defendants for:

A.   Compensatory (including consequential) damages of $ 2,000,000.00;

B.   Punitive damages of $10,000,000.00;

C.   Interest, costs; and

D.   Such other and further relief as the Court may deem proper and just.

## COUNT 4

### Claim for Debt and to
### Set Aside Conveyance of Real Estate Due to Fraud

117.   PCS-Global, John D. Mlinarcik and Connie K. Mlinarcik repeat and re-allege each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.

118.   Defendants on or about September 5, 2003 executed and delivered to plaintiffs two (2) promissory notes in the following words and figures:

### a. Promissory Note

For value received, the undersigned, of 4212 Ridge Road, Baltimore, Maryland 21236, hereby promises this 5 day of September, 2003, to pay to John D. Mlinarcik and Connie K. Mlinarcik, at 1515 Grant Avenue, Harrison, Michigan 48625, or such other place as the holder hereof may indicate by notice to the undersigned from time to time, the principal sum of four hundred thousand dollars ($400,000), with interest thereon at 6% per annum, in equal monthly installments of principal and interest, based upon a 120-month amortization period, of $4,440.82, beginning on October 5, 2003 and on the 5th of each month thereafter until the earlier of (a) the date five (5) years from the date hereof, and (b) the closing of resale by the undersigned of such portion of the 127-acre property conveyed today to the undersigned by payees that the portion thereof remaining has a market value of less than the aggregate of the outstanding balances of this promissory note and the $250,000 promissory note issued by the undersigned to the payees simultaneously herewith, upon either of which date or event the entire principal and interest then remaining unpaid shall be due and payable. The undersigned hereby waives presentment, demand, notice of non-payment or dishonor, and protest, and agrees to pay all reasonable expenses and attorneys' fees of collection. This promissory note is secured by the lien of a mortgage on such property of this date which shall be junior to the liens securing any future loans to the undersigned principally financing its purchase of such property from payees.



SCHAEFER & STROHMINGER, INC.

/s/   Gordon W. Priest Jr
　　　Witness

By_____/s/_____
　　　　　　David G. Strohminger
　　　　　　　　President

### b.Promissory Note

For value received, the undersigned, of 4212 Ridge Road, Baltimore, Maryland 21236, hereby promises this 5 day of September, 2003, to pay to John D. Mlinarcik and Connie K. Mlinarcik, at 1515 Grant Avenue, Harrison, Michigan 48625, or such other place as the holder hereof may indicate by notice to the

undersigned from time to time, the principal sum of two hundred fifty thousand dollars ($250,000), without interest thereon, upon the earlier of (a) the date five (5) years from the date hereof, and (b) the closing of resale by the undersigned of such portion of the 127-acre property conveyed today to the undersigned by payees that the portion thereof remaining has a market value of less than the outstanding balance of this promissory note. The undersigned hereby waives presentment, demand, notice of non-payment or dishonor, and protest, and agrees to pay all reasonable expenses and attorneys' fees of collection. This promissory note is secured by the lien of a mortgage on such property of this date which is junior to the liens securing the loans to the undersigned principally financing its purchase of such property from payees.

SCHAEFER & STROHMINGER, INC.

___/s/  Gordon W. Priest Jr
     Witness

By_____/s/_____
           David G. Strohminger
           President

119.    A copy of the above promissory notes are annexed as EXHIBIT E hereto.

120.    Under these two promissory notes, defendants promised to pay plaintiffs or to order on the 1st day of each month subsequent to September 2003, the sum of $4,440.82 including principal and interest thereon at 6% on the $400,000.00 promissory note, and to pay plaintiffs the entire amount of the $250,000.00 promissory note at the expiration of five (5) years, or at the subsequent sale of the property conveyed to defendants, whichever is sooner.

121.   Defendants agreed therein to waive all presentment, protest or notice of non-payment and agreed to pay all reasonable expenses and attorney's fees of collection thereupon.

122.   Defendant S&S owes to plaintiff the amounts of said notes plus interest.

123.   Defendant S&S on or about December 31, 2006 affirmatively defaulted on the said notes, thereby defrauding plaintiffs of their compensation for work performed by PCS-Global under payments credited totaling $850,000.00, and the promissory notes totaling $650,000.00 plus interest, and furthermore defrauding plaintiffs from the ownership of their real estate which was conveyed to defendant for the purchase price of $2.5 million dollars, which real estate was both the personal residence and business location of plaintiff prior to the conveyance.

124.   Defendant S&S did default on the said promissory notes for the purpose of defrauding plaintiff and hindering and delaying the collection of the indebtedness evidenced by the notes referred to above, such fraud being evidenced by the malicious notice given to plaintiff attached hereto as Exhibit C whereby defendant states that plaintiff has no remedy but to purchase back the subject real property "for $1.18 million" since, "the considerably more distasteful alternative is for you to initiate foreclosure, a process which will take months, possibly years, to reach economic consummation.  If anything remains after auction commissions, legal fees and expenses, and the discharge of the first lien, we'll be surprised.  Of course, to the extent that you come up short, you

may pursue a deficiency judgment in the Maryland courts, but we would take that unwelcome opportunity to counterclaim for all of the damages suffered by our enterprise…". Such malicious and fraudulent blackmail concerning defendant's just and owing debt to plaintiff and conveyance of the subject real property amounts to per se fraudulent and malicious inducement to convey the real property in question and to defraud plaintiff of the just and owing promissory notes and the credited payments for work performed under contract for defendants.

WHEREFORE, based upon the due and owing debt and the fraudulent inducement to convey the real property, PCS-Global, John D. Mlinarcik and Connie K. Mlinarcik pray that the Court find in their favor and against defendants for:

    A.    Compensatory (including consequential) damages of $5,075,000.00;

    B.    Punitive damages of $20,300,000.00

    C.    Attorney's fees;

    D.    Interest, costs; or in the alternative

    E.    That this honorable Court exercise its equitable powers to set aside said fraudulent conveyance and order that title be transferred back to its rightful owners, John D. Mlinarcik and Connie K. Mlinarcik;

    F.    Award damages of $1 million dollars in order for Mr. & Mrs. Mlinarcik to restore and repair the property to its formerly beautiful and fully functioning state;

    G.    Attorney's fees;

    H.    Interest, costs; and

    F.    Such other and further relief as the Court may deem proper and just.

## COUNT 5

### Quantum Meruit

125.  PCS-Global repeats and re-alleges each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.

126.  PCS-Global did perform and complete two service contracts entitled letter agreements 1 and 2 on behalf of defendants, leveraging its resources, staff and copyrighted materials for its benefit during an intense period of work from March 1, 2002 through January 15, 2003.

127.  PCS-Global was wrongfully induced and required to "credit back" the monies paid and justly owed them, having income and employment taxes already paid thereon, in order to continue in a contractual relationship with defendant Schaefer & Strohminger.

128.  Defendants have benefited from the work performed and the branding campaign efforts provided by the professional consultation services of plaintiff, and have wrongfully refused to pay for the services and work provided.

129.  PCS-Global was not readily able to realize the failure and refusal to pay for its services until it was notified on or about December 15, 2006 that defendants were no longer going to make payments on its promissory notes it had signed as part of a trade for

services and work performed by PCS-Global for defendants amounting to a pattern of racketeering.

130.  Defendants did maliciously deprive plaintiff of its wages upon its default of the promissory notes and wrongful inducement to "credit back" payments made to PCS-Global in trade for the sale of the subject real property.

WHEREFORE, based upon the due and owing debt and the work performed in Quantum Meruit, PCS-Global prays that the Court find in their favor and against defendants for:

> A.      Compensatory damages of $ 1,193,422.00;
> B.      Punitive damages of $10,000,000.00
> C.      Attorney's fees;
> D.      Interest, costs; and
> E.      Such other and further relief as the Court may deem proper and just.

## COUNT 6

### Tortious Interference with Contractual Relations

131.  PCS-Global repeats and re-alleges each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.

132.  On or about March 2003, PCS-Global employed an automotive industry expert to serve as its Senior Consultant and Director of the PCS-Global Center for Automotive Research, named Anthony "Tony" Gomez.  Mr. Gomez's experience, credentials and value to PCS-Global was great as he occupied a key position in the PCS-

Global executive leadership.  Mr. Gomez's salary and benefits with PCS-Global exceeded $240,000.00 annually.

133.  Beginning in June 2003, defendants did attempt to tortiously interfere with the contractual relationship between PCS-Global and its executive employee Tony Gomez by separate encounters with Mr. Gomez in which defendants recognized the value of Mr. Gomez to the automotive industry and PCS-Global, and suggested to Mr. Gomez that he consider leaving PCS-Global to be employed with defendants in a managerial capacity.

134.  Mr. Gomez advised defendants of his contractual relationship with PCS-Global and declined defendant's invitation.

135.  Defendants Schaefer & Strohminger, Inc., Joseph M. Jankowski and Lou Schaefer, nevertheless, throughout the summer of 2003 deliberately arranged for Mr. Gomez to fulfill a fulltime operational role as a Store Manager therefore departing from PCS-Global as a fulltime consultant and to join defendant's companies for all intents and purposes.  By the summer of 2004, without legal justification, defendants intentionally and improperly interfered with Mr. Gomez's performance of his Contract with PCS-Global by inducing him to breach said Contract and to enter into a contract of employment with defendants' companies.  Defendants' knew that Mr. Gomez was under contract to PCS-Global.  Defendants intentionally misrepresented to Mr. Gomez the quality of PCS-Global's general operations and the ability of PCS-Global to adequately

satisfy its clients.  Defendants offered Mr. Gomez more money for salary and additional fringe benefits if he would join defendants' companies.

136.  As a result of defendants' inducements and calculated planning, Mr. Gomez in August 2003 began his operational position for S & S by joining defendants' as a shared employee.  Defendants' notified PCS-Global that unless they were to agree to a joint compensation and joint employment arrangement which defendants were offering Mr. Gomez, in which Mr. Gomez would be a shared employee of defendants and they would split his $20,000.00 monthly salary with 50% paid by PCS-Global, then  PCS-Global would be compromising the success of the consulting engagement and eventually their $3,000,000 earn out.  In order to prevent the erosion of the consulting effort and their relationship with the defendants,  PCS-Global acquiesced in the joint employment arrangement.  On July 1, 2003, Mr. Gomez departed the fulltime consulting efforts of PCS-Global and joined defendants' operational role, working full-time for defendants as a Store Manager and later replaced their Operations Director, again with PCS-Global, this time under threat, to be required to still pay 50% of his salary ($10,000 per month)  in order that PCS-Global might not lose the ability to continue its successful work and relationship with defendants and the potential to re-hire Mr. Gomez full-time for other consultation projects which PCS-Global would contract to provide in its ongoing business concern. Defendants repeatedly offered Mr. Gomez fulltime employment even up through July 2004, the month defendants' fraudulently terminated PCS-Global's consultancy with S & S.

137.  PCS-Global lost another employee, Chris "Lucky" Gomez, due to the same arrangements. He became a shared employee, wherein the defendants offered Chris Gomez a Store Manger's operational role and PCS-Global was required to pay 50% of his salary as well. While initially there were offers for Chris to remain an employee for the defendants as well, when PCS-Global was summarily dismissed, both Tony Gomez and Chris "Lucky" Gomez had to leave their employ with PCS-Global, relocate to Ohio and Michigan for automotive industry management jobs, both with significant equity ownership interests.

138.  As a result of the conduct of defendants, PCS-Global has suffered and will continue to suffer extensive lost profits and other consequential damages. Such losses also resulted in the loss of good will, marketing opportunities, momentum and brand image within the automotive industry where PCS-Global, as a 30 year old company, has operated its consultation services nearly exclusively for over 17 years.

WHEREFORE, demands judgment against defendants and prays that the Court find in their favor and against defendants for:

      A.      Compensatory (including consequential) damages of $ 4,000,000.00;

      B.      Punitive damages of $10,000,000.00

      C.      Attorney's fees;

      D.      Costs; and

      E.      Such other and further relief as the Court may deem proper and just.

## COUNT 7

### Wrongful Termination

139.  George A. Kuehn, Jr. repeats and re-alleges each and every allegation contained in Paragraphs 1 through 67, inclusive, of this Claim as if fully set forth herein.

140.  On or about March 2003 plaintiff George A. Kuehn, Jr. ("Kuehn") was recruited for employment with S&S Management Services, Inc. for a yearly salary of $110,000 plus a 10% cost-savings annual bonus.

141.  On or about March 24, 2003 Kuehn entered into the employment of defendant S&S Management Services, Inc. and received said salary and a bonus at the end of the year for $10,000.

142.  During the year 2004, discussions were continually held between  Kuehn and S&S CEO, Joseph Jankowski, regarding cost-saving and improperly reported or non-reported cash expenditures of S&S Management on behalf of employees.

143.  Two examples of such discussions included a BMW 7 series used by Jankowski but not reported as a taxable income or benefit and company-wide free gasoline usage for employees without tracking and reporting the benefits as taxable income on employee W-2s.

144.  Jankowski and/or David Strohminger stated to Kuehn that his requests would "take too much time and money" to perform and that "ultimately the risk is the employees', not S&S".

145.  Kuehn expressed his disagreement with this practice, yet continued to perform his job faithfully and to seek to find additional cost-saving measures.

146.  Kuehn, upon request, met with in-house counsel Gordon Priest on October 5, 2004 and was requested by Mr. Priest to review, sign and certify an "amendment agreement" to the Master Loan documents with DaimlerChrysler Services North America LLC, a multi-million dollar leveraged line of credit S&S held.

147.  Upon review of the document, Kuehn explained that he could not in good conscience sign and certify the document without being permitted to review all the financial documentation the document was requiring that he certify as to accuracy and current status of all debts, and other financial information.

148.  Mr. Priest stated that he would inform Jankowski and David Strohminger of Kuehn's decision.

149.  Without any other prior explanation, contact or statement to Kuehn, on or about thirty one days later, after Mr. Kuehn had just completed an almost two-week medical leave of absence for his wife's emergency surgery due to an appendix rupture and subsequent infection, Jankowski and David Strohminger called Kuehn into a private meeting and under extreme duress demanded that Kuehn either resign or be terminated from the employment of S&S Management Services, Inc., because "we no longer trust the information coming out of your office."

150.  On or about November 29, 2004, Jankowski sent Kuehn a certified letter by U.S. mail stating among other things that "I offered you the professional courtesy of a resignation versus a termination" admitting to the fact that he had so threatened to terminate Kuehn's employment, being only shortly after Kuehn had refused to fraudulently certify a loan document to DaimlerChrysler Services North America LLC unless S&S Management would provide him with full access to the financial information and non-financial information of which status he was being asked to certify.

151.  The foregoing actions amounted to a retaliatory termination, in breach of good faith and fair dealing, and in fact a constructive discharge, for Kuehn's refusal to participate in a fraudulent activity of an illegal certification of loan documents.

WHEREFORE, due to the wrongful termination from employment, plaintiff Kuehn has suffered damages and prays this honorable Court award the following:

A.  Compensatory (including consequential) damages of $114,000;

B.  Punitive damages of $500,000;

C.  Attorney's fees;

D.  Interest, costs, and court fees; and

E.  Such other and further relief as the Court may deem proper and just.

Daniel Lewis Cox
The Cox Law Center, LLC
P.O. Box 245
Secretary, Maryland 21664
Telephone: 410-943-0004
Fascimile:  410-943-0034
Email: founderslaw@gmail.com
Bar No.: 28245

Michael E. Marr
Michael E. Marr, Attorney-at-Law
3107 Tyndale Ave.
Baltimore, Maryland 21214-3429
Telephone: 410-254-7000
Fascimile:  410-2547220
Email: mmarr@marrlaw.com
Bar No.: 00099

Attorneys for plaintiff