IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| PROFESSIONAL CONSULTATION | * | |
| SERVICES, INC., ET AL. | * | |
| | * | |
| v. | * | Civil No. JFM-07-1917 |
| | * | |
| SCHAEFER & STROHMINGER, INC., | * | |
| ET AL. | * | |
| | ***** | |

MEMORANDUM OPINION

Professional Consultation Services ("PCS-Global"), John and Connie Mlinarcik (the "Mlinarciks" or, when mentioned individually, "John" or "Connie"), and George Kuehn ("Kuehn") have brought this action against Schaefer & Strohminger, Inc., et al. ("S&S").[1] Invoking this court's federal question jurisdiction, in Count I plaintiffs allege a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (West 2000 & Supp. 2005), for which 18 U.S.C. §1964 provides civil remedies. In Counts II-VII, plaintiffs assert various state law claims. Defendants have moved to dismiss the RICO count for failure to state a claim, and they moved to dismiss the state law claims on the ground that I should decline to exercise the supplemental jurisdiction over them. Defendant's motion will be granted.

---

[1] There are ten named defendants. Defendant Schaefer & Strohminger, Inc. ("S&S") "is a Maryland automobile dealership owned by defendants Louis Schaefer ("Schaefer") and David Strohminger ("Strohminger")." (*Id.* ¶¶ 7, 14-15.) Defendant S&S Management Services, Inc. ("S&S Management") is a Maryland corporation that oversees and manages S&S companies (*Id.* ¶ 8.), and defendant Ridge Road Associates is a company that operates as the transition team for future S&S companies' executives. (*Id.* ¶ 9.) The complaint also names as defendants four automobile dealerships, Schaefer & Strohminger Bel Air, Inc., SKS Auto Park, Inc., Smith Motor Company, and Bel Air Dodge, Inc., all of which are owned by Schaefer. (*Id.* ¶¶ 10-13.) Defendant Joseph Jankowski ("Jankowski") is an S&S shareholder and the CEO of Schaefer's companies; "[a]ll employees and personnel report to [him] as does [Strohminger]." (*Id.* ¶ 16.)

II.

The facts, as alleged in plaintiffs' complaint, are as follows.

Plaintiff John is the CEO and president of PCS-Global, "a national professional consultation and training company with nearly thirty (30) years experience and success in the automotive industry." (Compl. ¶¶ 3-4.) From January of 1982 until recently, John's wife, Connie, acted as manager of PCS-Global's headquarters, the Carriage Inn Bed & Breakfast and Conference Retreat Center (the "Carriage House"), located on a 127-acre parcel of land in Michigan that the Mlinarciks owned. (*Id.* ¶¶ 5, 22.) The fourth plaintiff, whose role in the allegations is discussed in more detail below, is Kuehn, defendants' former Chief Financial Officer ("CFO").

A.

According to the complaint, on February 15, 2002, S&S hired PCS-Global to "perform an in-depth consultation review, conduct strategic planning and advise S&S's re-organization and implementation steps," entering a contract to pay PCS $1.2 million for its services. (*Id.* ¶ 24; *see also* Compl. Ex. A (agreement between PCS and S&S Management, dated 3/7/02).) This business relationship between S&S and PCS-Global was the site of the first of two schemes alleged in plaintiffs' complaint. As PCS-Global "produced and implemented a reorganization and restructuring strategy" for S&S, including referring S&S to a branding company who developed their slogan, defendants began "to conspire to . . . continually deceive . . . PCS-Global into believing S&S would pay [its] consulting fees," but never intending to do so.[2] (*Id.* ¶¶ 25-

---

[2] Plaintiffs' Exhibit A shows that during the period from March 7, 2002 to August 12, 2003, defendants made several payments to PCS-Global, totaling $855,505.20. (Compl. Ex. A.)

26.)

In November of 2002, defendants allegedly threatened to fire PCS-Global unless it "provide[d] added 'security' to S&S." (*Id.* ¶ 27.) As security, S&S proposed the Carriage House, appraised at $2.5 million, in exchange for a two-year, $3 million contract with PCS-Global.[3] (*Id.* ¶ 28.) To "sweeten" the deal, Schaefer offered to hire Connie to work at his Pintail Point Farm Bed & Breakfast ("Pintail Point") on Maryland's Eastern Shore to "gain[] her trust and experience in bed & breakfast management and [to induce] the Mlinarciks [to] move their corporate headquarters and home to Baltimore . . . or its vicinity." (*Id.*) On January 17, 2003, "to prevent substantial and severe loss to their corporation and employees," the Mlinarciks agreed to the deal, transferring equitable title to their Carriage House property to S&S in exchange for the $3 million contract. (*Id.* ¶ 29.) On September 5, 2003, plaintiffs were "enticed into signing a deed conveying" the Carriage House to S&S. (*Id.* ¶ 30.)

Allegedly, S&S subsequently instituted a "requirement that PCS-Global credit back to S&S all payments made to date for consultancy work performed[] to be considered as a 'down-payment' on the real estate." (*Id.* ¶ 32.) S&S further promised to convey to the Mlinarciks a yacht worth $275,000 as a down payment on the real estate; however, although title was purportedly conveyed (*see id.* Ex. B), the title and the boat were never turned over. (*Id.* ¶ 33.) Defendants proceeded to charge plaintiffs for the use of the yacht, even though the Mlinarciks never had access to it. (*Id.* ¶ 34)

Plaintiffs also allege that "[t]hroughout the summer of 2003 and leading up to July 2004,

---

[3] Plaintiffs allege that this contract was in addition to the $480,505.20 in consultancy fees S&S had already paid PCS-Global and advance payments through the date of the title transfer to total $375,000. (Compl. ¶ 28.)

defendants S&S Management, S&S, Jankowski and other [S&S] officers and personnel were actively . . . attempt[ing] to lure national PCS-Global executive professional consultants" away to work for S&S companies.  (*Id.* ¶ 45.)  Allegedly, S&S successfully recruited two PCS-Global employees, including Connie, who left her full-time employment at the Carriage House in June 2002 to "consult and serve as interim retreat center management staff at . . . Schaefer's Pintail Point."  (*Id.* ¶¶ 45-46.)  Connie's employment at Pintail Point was terminated on December 31, 2002, and in January of the following year, S&S required her to return half of her entire salary "in order for PCS-Global to continue [its] consultancy with S&S."  (*Id.* ¶ 48.)

In the meantime, Jankowski, the CEO of the Schaefer companies, returned to work following back surgery and opposed the increased managerial control Schaefer and Strohminger had granted PCS-Global during his absence.  (*Id.* ¶¶ 35-36.)  On July 24, 2004, S&S terminated PCS-Global's consulting relationship with S&S companies.  (*Id.* ¶ 37.)  S&S subsequently defaulted on all payments to PCS-Global, but kept PCS-Global's land and the promised yacht.  (*Id.* ¶ 38.)  Although defendants agreed to a deal where the Mlinarciks would remain "operational managers" of the Carriage House for two years[4] in exchange for S&S "reimburs[ing] PCS-Global for certain expenses and bills in managing" it, defendants allegedly did not follow through on that promise.  (*Id.* ¶ 39.)  On November 28, 2005, S&S demanded that the Mlinarciks "acquiesce to a refinancing scheme."  (*Id.* ¶ 40.)  Defendants then notified PCS-Global via a December 15, 2006 email that they would be defaulting on the Promissory Notes in place to secure payment on the real estate and demanded that PCS-Global buy back the Carriage

---

[4] Defendants' counsel allegedly demanded that John "undertake no reckless acts" and "remain at the Inn . . . paying utilities for the Inn and grounds . . . in order to not 'imperil the condition of the property.'" (Compl. ¶ 39.)

House for $1.18 million, threatening that if PCS-Global refused, S&S would ensure that foreclosure stalled for years. (*Id.* ¶¶ 42-43, Ex. D.)

B.

Plaintiff Kuehn was hired as the CFO of defendant S&S Management on March 24, 2003. (*Id.* ¶¶ 6, 8, 49.) When hired, Kuehn agreed to an annual salary of "$110,000 plus 10% of any cost savings he would generate the company annually." (*Id.* ¶ 50.) During his first year as CFO, Kuehn received the agreed upon salary plus a $10,000 bonus, but at his first year-end review, Jankowski informed Kuehn "that his employment would no longer include any bonuses as his bonus 'caps out at $10,000.'" (*Id.* ¶ 51.) Kuehn nonetheless continued working for S&S. (*Id.*)

Plaintiffs allege a series of incidents where defendants thwarted Kuehn's efforts to save costs and ensure that S&S followed proper accounting practices. On June 22, 2004, Kuehn told Jankowski that S&S Management was improperly failing to report its gasoline usage on its W-2s. (*Id.* ¶ 52.) At Jankowski's instruction, Kuehn consulted with a tax expert, who confirmed that S&S Management's policy violated the rules of accounting. (*Id.* ¶¶ 53-55.) Although Kuehn relayed that information to S&S executives, including Jankowski and Strohminger, they declined to change their policy. (*Id.* ¶¶ 52-57.) In a separate incident, Jankowski instructed Kuehn not to report the fair market value of Jankowski's BMW series 7 company car on his W-2, despite Kuehn's advice that such an omission was improper. (*Id.* ¶ 59.) Finally, in October of 2004, S&S's in-house counsel presented Kuehn with a Daimler/Chrystler "Amendment to Master Loan and Security Agreement and Related Documents" to sign, confirming that the financial statements therein accurately reflected the S&S entities covered by the agreement. (*Id.*

5

¶ 60.)  Although Kuehn protested "that he had not been provided the necessary financial information" to sign in good faith and requested that information, the S&S Advisory Board's executive leadership "summarily denied" that request.  (*Id.* ¶¶ 61-62.)

On November 5, 2004, Jankowski and Strohminger called Keuhn into a private meeting where "Strohminger stated that he had 'lost confidence in the data coming from [Mr. Kuehn's] office' and that [Kuehn] had a choice of" resigning and receiving payment through the end of the month or being terminated and receiving no payment.  (*Id.* ¶ 64.)  "[U]nder extreme duress and in violation of his contract with S&S Management for employment," Kuehn chose to resign.  (*Id.* ¶¶ 64-65.)

II.

Plaintiffs' RICO claim is so poorly drawn that only a brief discussion of the issues is necessary.

One of the requirements for establishing a RICO violation is that the defendant(s) engaged in "a pattern of racketeering activities."  18 U.S.C. § 1962; *see ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir. 2002).  The "pattern" requirement, in turn, requires that the predicate acts of illegal conduct that the defendant(s) allegedly committed were "related" and "continuous."  *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).  The "pattern" inquiry is flexible and is "to be decided on a case-by-case" basis, considering factors such as "the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential

6

for multiple distinct injuries." *Brandenberg v. Seidel*, 854 F.2d 1179, 1185 (4th Cir. 1988).[5]

As reflected by the summary of plaintiff's allegations provided in section I of this Memorandum Opinion, plaintiffs assert that defendants engaged in two distinct fraud schemes. In the first scheme, defendants "allegedly continually deceive[d]" PCS-Global and the Mlinarciks "into believing S&S would pay PCS-Global consultancy fees" to extract services and real estate for which defendants did not intend to fully pay. The second scheme allegedly involved securing an employment contract with Kuehn under false pretenses.

These two schemes cannot be joined together to meet RICO's pattern requirement because they were unrelated, involving different purposes and victims. Neither do either of the alleged schemes standing alone meet the pattern requirement because they do not meet the "continuity" sub-requirement.

In determining continuity, the ultimate focus is on whether the predicate acts indicate "ongoing unlawful activities whose scope and persistence poses a special threat to social well-being." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (citations omitted). The emphasis is on the actions' repetition. *Id.* at 683-84 ("Continuity . . . refers 'either to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*.'") (emphasis in original) (finding no continuity where "[d]efendants' actions were narrowly directed towards a single fraudulent goal . . ., involved a limited purpose . . ., one perpetrator . . ., one set of victims . . ., [and] the transaction took place over approximately one

---

[5] The "predicate acts" allegedly committed by defendants here were wire fraud and mail fraud. Although wire and mail fraud violations are legally sufficient to constitute predicate acts under the RICO statute, the Fourth Circuit has warned that courts must be "cautious about basing a RICO claim on predicate acts of mail and wire fraud because '[i]t will be the unusual fraud that does not enlist the mails and wires in its services at least twice.'" *Al-Abood ex. rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citations omitted).

year."). Importantly, "the existence of a single scheme alone, while not dispositive, can be relevant to the continuity inquiry." *Menasco*, 886 F.2d at 684; *see also Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 843-44 (E.D. Va. 2007) (finding no continuity where the fraud took place over the course of one year and had the specific purpose of defrauding a single victim); *cf. Brandenberg*, 859 F.2d at 1186 (finding continuity where acts in a single scheme "spanned a period of more than three years and were directed at more than 22,000 putative victims," distinguishing it from a single scheme that targets "a small group of victims in connection with a single transaction.").

In the instant case, each of the two separate schemes had distinct victims and did not target the public at large. Moreover, each of the schemes allegedly had specific purposes that were fulfilled when the schemes were consummated. Thus, there is no basis to infer from plaintiff's allegations that defendant's conduct was ongoing or threatened social well-being.[6]

In short, plaintiffs allege (at most) garden-variety fraud claims that do not fall within the intended purview of the RICO statute. *Menasco*, 886 F.2d at 683. If plaintiffs want to pursue such claims, they should do so in state court. Accordingly, in addition to dismissing plaintiff's RICO claims for failure to state a claim upon which relief can be granted, I will decline to exercise supplemental jurisdiction over the state law claims that plaintiffs have appended to their

---

[6] I note that in their opposition memorandum, plaintiffs argue that "not only do we have years of a pattern and scheme to defraud Plaintiffs in multiple ways, but we have others similarly situated in the past and present who also have been defrauded in the same or similar manner as Plaintiffs." (Pls.' Opp'n Mot. at 24). This argument (that is not supported by any allegations in the complaint) is wholly insufficient to meet the particularity requirement established by Fed. R. Civ. P. 9(b) concerning claims of fraud. This requirement applies as to RICO claims. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 548 (4th Cir. 2001); *Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787, 799 (D. Md. 1998).

RICO claim.  *See* 18 U.S.C. §1367(c)(3).

A separate order effecting the rulings made in this memorandum is being entered herewith.

Date: February 26, 2008          /s/_____
                                 J. Frederick Motz
                                 United States District Judge